IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KAMEL B. JONES, JR.                    *        Civil Action No.: 22CV2628-JRR
8655 Graves Av, Apt: 86
Santee, California 92071               *
        Plaintiff                      *

v.                                     *

THE CITY OF SALISBURY, MARYLAND *
The Salisbury Police Department
699 W. Salisbury Parkway               *
Salisbury, Maryland 21801
                                       *
        and                            *

BARBARA DUNCAN                         *
Salisbury City Chief of Police
699 W. Salisbury Parkway               *
                                       *

*    *    *    *    *    *    *    *    *    *    *    *    *

FILED _____   ENTERED _____
LOGGED _____   RECEIVED _____

OCT 1 2 2022

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

## COMPLAINT

Plaintiff, Kamel B. Jones, Jr., files this Complaint against Barbara Duncan in her official capacity as Chief of the Salisbury, Maryland Police Department, and the City of Salisbury, and as causes of action state as follows:

### NATURE OF THE CASE

1.  This case is brought under Title VII of the Civil Rights Act of 1964 by former Salisbury Police Officer Kamel B. Jones, Jr., (hereinafter "Officer Jones") This case alleges discrimination in the workplace based on race. The claims are brought against the City of Salisbury and its Chief of Police, Barbara Duncan.

2.  On July 15, 2022, Officer Jones received a Right to Sue letter from the United States Equal Employment Opportunity Commission.

1

3.     Officer Jones first became interested in law enforcement as a career around the
Spring of 2017, during his senior year at James M. Bennett High School. Around
this time, Officer Jones took criminal justice classes which were taught Cpt. Paul
Simon, who at that time was with the Salisbury Police Department (hereinafter
"SPD"). Officer Jones enjoyed the classes and seriously considered becoming a
police officer.

4.     After he graduated from high school, Officer Jones interned with the City of
Salisbury, working under the supervision of Mayor Jake Day, where he researched
analytics and day-to-day municipal operations. Officer Jones performed above
everyone's expectations during the internship. Since he had previously expressed his
interest in becoming a police officer, in the summer of 2017 Officer Jones was
chosen to participate in the first-ever cadet program for the SPD. As a cadet,
Officer Jones worked in a citizen, quasi-law enforcement capacity under the close
supervision of the SPD.

5.     Officer Jones began working for the SPD in an official capacity on October 16,
2017. His assigned Department was Salisbury Police—Patrol Division (D Squad).
His Position Title was Police Communications Officer.

6.     From the outset, Officer Jones graded-out consistently well in his annual Employee
Performance Appraisals. For appraisals, the SPD uses a 4-point system to grade
what it describes as "Standards of Performance." These include:

4.     Commendable

3.     Satisfactory

2.     Needs Improvement

1.     Unsatisfactory

2

7.    Officer Jones' first Employee Performance Appraisal was June 25, 2018. At the time of the first Appraisal, Officer Jones had been employed by the SPD for approximately 8 months. The appraisal was supervised and rated by Lt. C. Crockett. Officer Jones was graded on a variety of general factors, ranging from "Dependability/Punctuality" to "Quality of Work." The appraisal also rated "Major Job Elements" which appear more specifically tailored to Officer Jones' job duties. At the end, Officer Jones' "overall rating" was a 3/4.

7.    On April 21, 2019, Officer Jones submitted a Request to Engage in Secondary Employment to the SPD. The request was denied by his Division Commander, who commented that "PSO Jones has work[ed] numerous hours of overtime @ SPD when there is a PCO shortage[,]" and "PCO Jones is a valuable PCO and is needed to work @ SPD when available for public safety reasons." A copy of these comments are included below:



8.    Officer Jones' second Employee Performance Appraisal was dated June 3, 2019. At the time of the second appraisal, Officer Jones had been employed by the Salisbury Police Department for 1 year and 8 months. The appraisal was supervised and rated by Lt. Howard Drewer and was substantially similar in format to the appraisal cited in paragraph 4 above. At the conclusion of this second appraisal, Mr. Jones scored a 3.4/4.

9.    On June 10, 2020, several hundred City of Salisbury residents participated in a "Black Lives Matter" protest and march, that ended outside the Salisbury Police

3

Department Headquarters. The purpose of the protest, generally, was to honor the life of George Floyd and push for larger-scale police reform. Officer Jones was working as a dispatcher on this day. He expressed to his supervisor that he was glad that the community was protesting for what it believes in, and also that it felt it was awful the way George Floyd lost his life. Officer Jones also stated that he "kind of wish he could join [the protest.]" He was told in response "If I were you, I wouldn't go out there. If admin saw you out there it would not look good. It would look bad on the police department and you would not want that especially if you wanted to continue working here."

10.   On or around June 19, 2020, Julia Glanz, who was at that time the acting mayor of Salisbury, came to SPD headquarters to meet with officers to discuss matters including the Black Lives Matter protests. Officer Jones and Officer Dasia Murphy, his fellow dispatcher (who is also Black), wanted to be a part of this meeting, both because they wanted to listen to what was being said, and they also felt they had ideas to contribute, especially considering they were two of the very few Black SPD employees. Therefore, when the meeting began, Officers Jones and Murphy proceeded to the second floor of police headquarters (where the meeting was being held) and requested to enter. Unfortunately, and for reasons that remain unknown, they were refused access and told to go downstairs and "remain in communications" on the first floor.

11.   Officer Jones was confused and disappointed by this response. Approximately one week later, Officer Jones requested a meeting with Barbara Duncan, the Chief of Police, to discuss issues related to being denied access to the meeting, and other

4

problems that Officer Jones perceived or experienced at the Salisbury Police
Department that were related to race.

12.     Officer Jones was allowed the opportunity to meet with Chief Duncan. During the
meeting, Chief Duncan told Officer Jones that the entire police department was
blindsided when the acting mayor simply showed up without providing the
department notice or warning of her arrival. Officer Jones did not argue or further
confront the Chief on this issue. He then advised Chief Duncan that he did not
agree with the ways certain supervisors (all white, all male) were dealing with
perceived problems in the Black community (such as the willingness to communicate
with officers, cooperate with police investigations, testify at witnesses in court, etc.),
without asking for input from the very few Black officers that worked in the SPD.

13.     In addition, during this same meeting with Chief Duncan, Officer Jones expressed
concerns that the SPD went out of its way to support its officers dealing with some
community-related issues or conflicts, but not others. For example, when former
SPD Officer Aaron Hudson committed suicide, or when Delmar, Maryland police
officer Keith Heacook was killed in the line of duty, the SPD offered a variety of
assistance, counseling and one-the-job support At the same time, following the
community's response to the death of George Floyd, and Black Lives Matter
Protests outside police headquarters, the SPD remained aloof or expressed little
interest in whether officers might need support. Officer Jones told Chief Duncan
that he felt the SPD's response to some issues (combined with its unresponsiveness
on other issues) led him to feel the SPD was making value-judgments on issues
based on race.

5

14.     During the meeting, Chief Duncan treated Officer Jones respectfully and appeared
        to be listening to him, but no action was ever taken in response to Officer Jones'
        concerns.

15.     On December 1, 2020, Officer Jones met with Sgt. Thompsen and Capt. Drewer,
        which was later described in a SPD Counseling Observation Form as being "in
        regarding [sic] a few concerns related to PCO Jones. These concerns included:

        A.      Capt. Drewer advised concern had been conveyed to him by Chief
                Swafford of the Fruitland [Maryland] Police Department related to
                several unprofessional communications by PCO Jones over the last
                several months;

        B.      Sgt. Thompsen mentioned that Officer Jones spoke
                "unprofessionally about [a] certain co-worker."

        C.      General concerns about "subverting [the] chain of command with
                regards to certain requests and work-related subject matter and
                maintaining an overall professional standard while on duty."

16.     The meeting described in paragraph 4 was resolved, by all known accounts, without
        further incident.  Three days later, on December 4, 2020, Officer Jones met again
        with Sgt. Thompsen and Corporal Foy to discuss the same topics, and for
        "counseling."  In this second meeting, Sgt. Thompsen noted that he had listened to
        one of the calls at issue from the Fruitland Police Department and "while there did
        seem to be a disagreement regarding the issue at hand, [he] did not detect any major
        issues of unprofessionalism from PCO Jones on that particular call."  In fact,
        according to Sgt. Thompsen, the problem seemed to be more related to "some type

6

of ill will" by the Fruitland officer.  After the meeting, on December 10, 2020, Sgt.

Thompsen wrote a report, where he concluded:

> Suggestions, Comments, Actions to be Taken:
>
> PCO Jones will ensure that he exhibits the highest level of professionalism going forward, especially when communicating with other police agencies. PCO Jones will be training a new police communications officer soon and will train the PCO in a manner listed above.
>
> During our conversation, PCO Jones had several good ideas and made some very good points related to certain things that could benefit the overall function of police communications. I encouraged PCO Jones to document his ideas and submit them for review by the command staff.

> Comments by Employee: (To be filled in by Supervisor)
>
> PCO Jones was receptive to counselling PCO Jones has shown great improvement with professionalism since our conversation. PCO Jones is expected to be a great FTO

17.     On January 29, 2021, Officer Jones received a Performance Progress Report, which

appears to be a condensed, mid-year version of the previous Employee Performance

Appraisals. Mr. Jones again graded very well, with individual ratings all being

"satisfactory" or "commendable."  His "Supervisor's Observation Suggestions;

Comments; Actions to be Taken" include:

> During the rating period of June—November 2020, PCO Jones is an
>
> excellent dispatcher who is capable of handling a wide range of CFS without
>
> needing assistance from a supervisor.  PCO Jones shows up to work early
>
> and is willing to assist with overtime when other shifts are shorthanded.
>
> PCO Jones has had some issues when dealing with other surrounding
>
> jurisdictions.  PCO Jones was addressed about [sic] his professionalism when

> communicating with other agencies. PCO Jones also needs to proofread [sic] his blotter entries for small grammatical errors.

18. On March 27, 2021, Officer Jones was sitting alongside Officer Dasia Murphy, who, like Officer Jones, is Salisbury Police Department dispatcher, and who, like Officer Jones, is Black. Officers Murphy and Jones heard two other officers, on the call, both white, make what they considered to be racist remarks. The initial call made to the police department was rather bizarre and should have been inconsequential-- a citizen called to complain about a chicken that escaped and was chasing people. The first officer then asked the caller for the color of the chicken. The caller responded "white." The two officers, walking amongst themselves, then commented:

Officer 1:    "It's always got to be white."

Officer 2:    "It's only a pack of Black people [being chased by the chicken]."

19. Besides not being funny, comments are inappropriately race-based, especially considering they were made by two white officers, in the listening presence of two black officers. Both Officers Jones and Murphy were surprised and offended that members of their police department were speaking so freely on these terms. They discussed the matter, and ultimately agreed that they should file an internal complaint.

20. Shortly thereafter, Officer Jones contacted his supervisor, Corporal Fissel, advised him what happened, and allowed him to listen to the recording. After this conversation, Corporal Fissel told Mr. Jones that he "would handle it."

21. Later that day, Officer Jones was ordered to attend a meeting with the Lieutenant, Sargent, and Corporal of this division. He was told that historically, a race-based

8

complaint had never been filed against an officer in the SPD, and that there were

many negative consequences (to the subject of the complaint). Officer Jones

considered what his supervisors requests, but replied that he would nonetheless like

to file a complaint. After making this known, however, it is believed that no Internal

Investigation file was ever opened.

22.     Upon information and belief, Mr. Jones' complaint was never meaningfully

addressed by anyone. In addition, it is believed that the SPD persuaded Officer

Murphy (outside the presence of Mr. Jones) that it would be in her best interest not

to file a complaint. Overall, there was considerable pressure, both express and

implied, used by white supervisors to convince Black Officers beneath them in the

chain of command not to make a complaint. Officer Jones was never questioned by

anyone from the Criminal Investigation Division ("CID"), no footage was reviewed,

and no objective determination on the merits of the complaint was ever made. To

the contrary, despite expressing his desire to make a complaint, Mr. Jones was not

even provided a form upon which to do so.

23.     On April 28, 2021, Officer Jones was working in dispatch and a woman came in the

police department lobby and was acting very erratically, including throwing chairs

around the lobby. Officer Jones came across the dispatch radio and asked officers to

respond to the lobby to handle the situation. While the officers were on their way,

the woman then laid down on the floor in the lobby. Officer Jones took a picture of

the woman and then sent the picture, by Snapchat, to other officers in the police

department. No other persons received the Snapchat message except officers.

24.     One officer, however, received the photograph sent by Officer Jones, and reported it

to his supervisor. That supervisor reported it to Officer Jones' supervisor. Officer

9

Jones was immediately placed on paid administrative leave.  The grounds for the suspension were described as "SPD Directives #702 pertaining to Social media use. [sic]."

25.    As part of this suspension, Officer Jones was required to "surrender to [his] commanding officer [his] issued badges, identification card and access cards."

26.    On May 12, 2021, Officer Jones was told that he must resign from the Salisbury Police Department, or he would be fired.  Given this ultimatum, Officer Jones chose to resign.

27.    While SPD forced Officer Jones to resign because it claimed he violated social media policies, there are other examples similar conduct, undertaken by other SPD officers and employees, where SPD took no disciplinary action, which establish the actions alleged reasons for Officer Jones' discipline are pretextual.  These include:







## VENUE AND JURISDICTION

28. This court has jurisdiction over this action pursuant to the provisions of 28 U.S.C. §§

    1331, 1332, 1343 and 1367, as well as principles of supplemental and pendant

    jurisdiction. Venue is appropriate in the court pursuant to 28 U.S.C. § 1391. This

    Complaint is filed under the Civil Rights Act of 42 U.S.C.S. § 1391. The causes of

    action alleged herein arise from factual allegations occurring within this judicial

    district

29. The amount in controversy exceeds $75,000.00.

## PARTIES

30. Plaintiff, Kamel B. Jones, Jr., is an individual who resides in Salisbury, Maryland.

11

31.     Defendant, Barbara Duncan, is a resident of Salisbury, Maryland and acted both individually and under color of law as an agent or employee of the City of Salisbury, Maryland, and as Chief of the Salisbury Police Department.

32.     Defendant, the City of Salisbury, Maryland is a municipality located within this District.

## COUNT I – TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (EMPLOYMENT DISCRIMINATION BASED ON RACE)

33.     Plaintiff, Kamel B. Jones, Jr. incorporates by reference the facts and allegations set forth in paragraphs 1-32 above, as if fully set forth hereunder.

34.     Officer Jones, who is Black, is a member of a protected class.

35.     Officer Jones suffered an adverse employment action when he was forced to resign from employment at the SPD.

36.     At the time he was forced to resign, Officer Jones met the legitimate employment expectations of the SPD.

37.     Officer Jones was treated differently than similarly situated employees at the SPD who are not Black and are outside his protected class.  There are numerous examples of other SPD officers (all white) who broke major rules (and in some cases, laws) and were not disciplined or received a much less-severe discipline than Officer Jones. For example, in November 2021 an officer who was caught falsifying time records for payment was offered his job back.  In addition, numerous SPD supervisors (all white) have recently been caught falsifying documentation in the SPD property room.  These employees have been demoted one rank, but remain employed.

38.     In addition, many disciplinary polices at the SPD are violated but unenforced.  For example, many (all white) officers chew tobacco on the job, and SPD supervisors

12

know this. The SPD is aware of the violations of the tobacco policy, but choses not to enforce it.

39.   The social media policy was enforced as a technicality with the intent of removing Officer Jones from the SPD, because the SPD was uncomfortable with Officer Jones' race-related concerns and ideas. If Officer Jones was white he would not have been forced to resign.

40.   The alleged violation of the SPD's social media policy is not the real reason Officer Jones was forced to resign. The real reason is that the SPD was uncomfortable and did not like when Officer Jones would initiate or challenge the SPD on issues related to race. The SPD is almost entirely white, and its members (especially its supervisors) were bothered by Officer Jones' concerns, and did not want to address them publicly or privately.

41.   Defendants' misconduct has caused economic and non-economic damages to Officer Jones. Officer Jones was forced to resign; therefore he lost his income and benefits. In addition, Officer Jones intends to continue to work in law enforcement, and this incident (including the forced resignation) creates challenges for future employment opportunities. Officer Jones has also experienced heightened stress, anxiety, and loss of enjoyment of life as a result of Defendants' misconduct. Officer Jones has been damaged, and it is likely that he will continue to experience these damages in the foreseeable future. As a direct and proximate result of Defendants' misconduct, Officer Jones has suffered, and continue to suffer damages, including, but not limited to, past, present, and future economic damages, and emotional distress.

13

WHEREFORE, Plaintiff Kamel B. Jones, Jr. demands judgment against Defendants Barbara Duncan and the City of Salisbury, jointly and severally, for actual general, special, and compensatory damages in an amount which exceeds Seventy-Five Thousand Dollars ($75,000.00), plus punitive damages, plus the costs of this action, including attorneys' fees and expenses, and such other relief as the nature of his cause and principles of justice may require.

**PRAYERS FOR RELIEF**

WHEREFORE, the above premises considered, Plaintiff, Officer Kamel B. Jones, Jr., demands:

1. That process issue to Defendants, and that they be required to answer in the time allowed by law.

2. That judgment be rendered in favor of Plaintiff, and against Defendants, on all causes of action asserted herein.

3. That Plaintiff be awarded punitive damages against the Defendants in an amount sufficient to punish Defendants and discourage them and others from engaging in similar conduct in the future.

4. Nominal damages.

5. That Plaintiff be awarded the reasonable expenses incurred in this litigation, including reasonable attorney and expert fees, pursuant to 42 U.S.C § 1988 (b) and (c) and pre and post-judgement interest.

6. That Plaintiff receives other further and general relief as it may appear he is entitled.

7. A jury for the trial of this matter.

Date: October ____, 2022

_____/S/_____
Kamel Jones

14