IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KAMEL B. JONES, JR.                          *
[8655 Graves Av, Apt: 86
Santee, California 92071]                    *
      Plaintiff                            *

v.                                           *        Civil Action No.:  1:22-CV-02628-JRR

THE CITY OF SALISBURY, M**D**[ARYLAND]       *
**& BARBARA DUNCAN**
[The Salisbury Police Department                      **(shows changes to 1ˢᵗ complaint)**
699 W. Salisbury Parkway                     *
Salisbury, Maryland 21801
                                             *

      and                                  *

BARBARA DUNCAN                               *
Salisbury City Chief of Police
699 W. Salisbury Parkway]

      Defendants.

                                             *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**AMENDED <u>COMPLAINT</u>**

    Plaintiff, Kamel B. Jones, Jr., files this **Amended** Complaint against Barbara Duncan

in her **individual** [official] capacity as Chief of the Salisbury, Maryland Police Department, and the

City of Salisbury, and as causes of action state**s** as follows:

<u>**NATURE OF THE CASE**</u>

    1.    This case is brought under Title VII of the Civil Rights Act of 1964**, as amended,**

**and Section 1981 of the Civil Rights Act of 1866, as amended,** by former Salisbury Police Officer

Kamel B. Jones, Jr., (hereinafter "Officer Jones") This case alleges discrimination **and retaliation** in

the workplace based on race.  The claims are brought against the City of Salisbury and its Chief of

Police, Barbara Duncan.                                      **EXHIBIT 1**

2.     **On February 14, 2022 Officer Jones filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").** On July 15, 2022, Officer Jones received a Right to Sue letter from the **EEOC** [United States Equal Employment Opportunity Commission], **and his initial complaint was filed within 90 days thereof in this Court**.

## VENUE AND JURISDICTION

3.     This court has jurisdiction over this action pursuant to the provisions of 28 U.S.C. §§ 1331, 1332, 1343 and 1367, as well as principles of supplemental and pendant jurisdiction.  Venue is appropriate in the court pursuant to 28 U.S.C. § 1391.  This Complaint is filed under the Civil Rights Act of **1964, as amended,** 42 U.S.C.S. § **2000e-2(a)(1), 42 U.S.C. § 1981, as amended, and 42 U.S.C. § 1983[**1391].  The causes of action alleged herein arise from factual allegations occurring within this judicial district

4.     The amount in controversy exceeds $75,000.00.

## PARTIES

5.     Plaintiff, Kamel B. Jones, Jr., is an individual who **resided[s]** in Salisbury, Maryland **at all times relevant herein**.

6.     Defendant, Barbara Duncan, is a resident of Salisbury, Maryland and acted both individually and under color of law as an agent or employee of the City of Salisbury, Maryland, and as Chief of the Salisbury Police Department.  **She is sued in her individual capacity.**

7.     Defendant, the City of Salisbury, Maryland is a municipality **that operates a police department [**located] within this District.

## FACTS

8.     Officer Jones first became interested in law enforcement as a career around the

Spring of 2017, during his senior year at James M. Bennett High School.  Around this time, Officer

Jones took criminal justice classes which were taught **by** Cpt. Paul Simon, who at that time was with

the Salisbury Police Department (hereinafter "SPD").  Officer Jones enjoyed the classes and

seriously considered becoming a police officer.

9.      After he graduated from high school, Officer Jones interned with the City of

Salisbury, **where he researched analytics and day-to-day municipal operations, and**

**worked**[ing] under the supervision of Mayor Jake Day. [, where he researched analytics and day-to-

day municipal operations.]  Officer Jones performed above everyone's expectations during the

internship.  Since he had previously expressed his interest in becoming a police officer, in the

summer of 2017 Officer Jones was chosen to participate in the first-ever cadet program for the

SPD.  As a cadet, Officer Jones worked in a citizen, quasi-law enforcement capacity under the close

supervision of the SPD.

10.      Officer Jones began working for the SPD in an official capacity on October 16,

2017.  His assigned Department was Salisbury Police—Patrol Division (D Squad).  His Position

Title was Police Communications Officer.

11.      From the outset, Officer Jones graded-out consistently well in his annual Employee

Performance Appraisals.  For appraisals, the SPD uses a 4-point system to grade what it describes as

"Standards of Performance."  These include:

4.      Commendable

3.      Satisfactory

2.      Needs Improvement

1.      Unsatisfactory

12.      Officer Jones' first Employee Performance Appraisal was June 25, 2018.  At the time

of the first Appraisal, Officer Jones had been employed by the SPD for approximately 8 months. The appraisal was supervised and rated by Lt. C. Crockett. Officer Jones was graded on a variety of general factors, ranging from "Dependability/Punctuality" to "Quality of Work." The appraisal also rated "Major Job Elements" which appear more specifically tailored to Officer Jones' job duties. At the end, Officer Jones' "overall rating" was a 3/4.

13.    On April 21, 2019, Officer Jones submitted a Request to Engage in Secondary Employment to the SPD. The request was denied by his Division Commander, who commented that "PSO Jones has work[ed] numerous hours of overtime @ SPD when there is a PCO shortage[,]" and "PCO Jones is a valuable PCO and is needed to work @ SPD when available for public safety reasons." A copy of these comments are included below:



14.    Officer Jones' second Employee Performance Appraisal was dated June 3, 2019. At the time of the second appraisal, Officer Jones had been employed by the Salisbury Police Department for 1 year and 8 months. The appraisal was supervised and rated by Lt. Howard Drewer and was substantially similar in format to the appraisal cited in paragraph 4 above. At the conclusion of this second appraisal, Mr. Jones scored a 3.4/4.

15.    On June 10, 2020, several hundred City of Salisbury residents participated in a "Black Lives Matter" protest and march, that ended outside the Salisbury Police Department Headquarters. The purpose of the protest, generally, was to honor the life of George Floyd and push for larger-scale police reform. Officer Jones was working as a dispatcher on this day. He expressed to his supervisor that he was glad that the community was protesting for what it believes in, and also that **he [**it] felt it was awful the way George Floyd lost his life. Officer Jones also stated that he "kind of

4

wish he could join [the protest.]"  He was told in response "If I were you, I wouldn't go out there. If admin saw you out there it would not look good.  It would look bad on the police department and you would not want that especially if you wanted to continue working here."

16.     On or around June 19, 2020, Julia Glanz, who was at that time the acting mayor of Salisbury, came to SPD headquarters to meet with officers to discuss matters including the Black Lives Matter protests.  Officer Jones and Officer Dasia Murphy, his fellow dispatcher (who is also Black), wanted to be a part of this meeting, both because they wanted to listen to what was being said, and they also felt they had ideas to contribute, especially considering they were two of the very few Black SPD employees.  Therefore, when the meeting began, Officers Jones and Murphy proceeded to the second floor of police headquarters (where the meeting was being held) and requested to enter.  Unfortunately, and for reasons that remain unknown, they were refused access and told to go downstairs and "remain in communications" on the first floor. **Officer Jones was confused and disappointed by this response because the supervisors knew that another dispatcher was already covering the unit.**

17.     [Officer Jones was confused and disappointed by this response.]  Approximately one week later, Officer Jones requested a meeting with Barbara Duncan, the Chief of Police, to discuss issues related to being denied access to the meeting, and other problems that Officer Jones perceived or experienced at the Salisbury Police Department that were related to race.

18.     Officer Jones was allowed the opportunity to meet with Chief Duncan.  During the meeting, Chief Duncan told Officer Jones that the entire police department was blindsided when the acting mayor simply showed up without providing the department notice or warning of her arrival. Officer Jones did not argue or further confront the Chief on this issue.  He then advised Chief Duncan that he did not agree with the ways certain supervisors (all white, all male) were dealing with perceived problems in the Black community (such as the willingness to communicate with officers,

cooperate with police investigations, testify at witnesses in court, etc.), without asking for input from the very few Black officers that worked in the SPD.

19.     In addition, during this same meeting with Chief Duncan, Officer Jones expressed concerns that the SPD went out of its way to support its officers dealing with some community-related issues or conflicts, but not others.  For example, when former SPD Officer Aaron Hudson committed suicide, or when Delmar, Maryland police officer Keith Heacook was killed in the line of duty, the SPD offered a variety of assistance, counseling and one-the-job support  At the same time, following the community's response to the death of George Floyd, and Black Lives Matter Protests outside police headquarters, the SPD remained aloof or expressed little interest in whether officers might need support.  Officer Jones told Chief Duncan that he felt the SPD's response to some issues (combined with its unresponsiveness on other issues) led him to feel the SPD was making value-judgments **and employment decisions** on issues based on race.

20.     During the meeting, Chief Duncan treated Officer Jones respectfully and appeared to be listening to him, but no action was ever taken in response to Officer Jones' concerns.

21.     On December 1, 2020, Officer Jones met with Sgt. Thompsen and Capt. Drewer, which was later described in a SPD Counseling Observation Form as being "in regarding [sic] a few concerns related to PCO Jones.  These concerns included:

> A.     Capt. Drewer advised concern had been conveyed to him by Chief
> Swafford of the Fruitland [Maryland] Police Department related to
> several unprofessional communications by PCO Jones over the last
> several months;
>
> B.     Sgt. Thompsen mentioned that Officer Jones spoke
> "unprofessionally about [a] certain co-worker."

C.      General concerns about "subverting [the] chain of command with

regards to certain requests and work-related subject matter and

maintaining an overall professional standard while on duty."

22.      The meeting described in **the preceding** paragraph **[**4**]** was resolved, by all known

accounts, without further incident.  Three days later, on December 4, 2020, Officer Jones met again

with Sgt. Thompsen and Corporal Foy to discuss the same topics, and for "counseling."  In this

second meeting, Sgt. Thompsen noted that he had listened to one of the calls at issue from the

Fruitland Police Department and "while there did seem to be a disagreement regarding the issue at

hand, [he] did not detect any major issues of unprofessionalism from PCO Jones on that particular

call."  In fact, according to Sgt. Thompsen, the problem seemed to be more related to "some type of

ill will" by the Fruitland officer.  After the meeting, on December 10, 2020, Sgt. Thompsen wrote a

report, where he concluded:

Suggestions, Comments, Actions to be Taken:

PCO Jones will ensure that he exhibits the highest level of professionalism going forward, especially when
communicating with other police agencies. PCO Jones will be training a new police communications officer soon
and will train the PCO in a manner listed above.

During our conversation, PCO Jones had several good ideas and made some very good points related to certain
things that could benefit the overall function of police communications. I encouraged PCO Jones to document his
ideas and submit them for review by the command staff.

Comments by Employee: (To be filled in by Supervisor)

PCO Jones was receptive to counselling. PCO Jones has shown
great improvement with professionalism since our conversation. PCO Jones
is expected to be a great FTO

23.      **In reference to the issuance of the above-referenced Counseling Observation**

**Form, Sgt. Thompsen told Mr. Jones it is how Chief Duncan wanted the matter handled.**

24.      On January 29, 2021, Officer Jones received a Performance Progress Report, which

7

appears to be a condensed, mid-year version of the previous Employee Performance Appraisals. Mr. Jones again graded very well, with individual ratings all being "satisfactory" or "commendable." His "Supervisor's Observation Suggestions; Comments; Actions to be Taken" include:

> During the rating period of June—November 2020, PCO Jones is an excellent dispatcher who is capable of handling a wide range of CFS without needing assistance from a supervisor. PCO Jones shows up to work early and is willing to assist with overtime when other shifts are shorthanded. PCO Jones has had some issues when dealing with other surrounding jurisdictions. PCO Jones was addressed about [sic] his professionalism when communicating with other agencies. PCO Jones also needs to proofread [sic] his blotter entries for small grammatical errors.

25.     On March 27, 2021, Officer Jones was sitting alongside Officer Dasia Murphy, who, like Officer Jones, is Salisbury Police Department dispatcher, and who, like Officer Jones, is Black. Officers Murphy and Jones heard two other officers, on the call, both white, make what they considered to be racist remarks. The initial call made to the police department was rather bizarre and should have been inconsequential-- a citizen called to complain about a chicken that escaped and was chasing people. The first officer then asked the caller for the color of the chicken. The caller responded "white." The two officers, **talking [**walking] amongst themselves, then commented:

> Officer 1:     "It's always got to be white."
>
> Officer 2:     "It's only a pack of Black people [being chased by the chicken]."

26.     Besides not being funny, comments are inappropriately race-based, especially considering they were made by two white officers, in the listening presence of two black officers. Both Officers Jones and Murphy were surprised and offended that members of their police

department were speaking so freely on these terms.  They discussed the matter, and ultimately

agreed that they should file an internal complaint.

27.     Shortly thereafter, Officer Jones contacted his supervisor, Corporal Fissel, advised

him what happened, and allowed him to listen to the recording.  After this conversation, Corporal

Fissel told Mr. Jones that he "would handle it."

28.     Later that day, Officer Jones was ordered to attend a meeting with the Lieutenant,

Sargent, and Corporal of this division.  He was told that historically, a race-based complaint had

never been filed against an officer in the SPD, and that there were many negative consequences (to

the subject of the complaint).  Officer Jones considered [what] his supervisors' **observations**

[requests] but replied that he would nonetheless like to file a complaint.  After making this known,

however, it is believed that no Internal Investigation file was ever opened.

29.     Upon information and belief, Mr. Jones' complaint was never [meaningfully]

addressed by anyone.  In addition, it is believed that the SPD persuaded Officer Murphy (outside the

presence of Mr. Jones) that it would be in her best interest not to file a complaint.  Overall, there

was considerable pressure, both express and implied, used by white supervisors to convince Black

Officers beneath them in the chain of command not to make a complaint.  Officer Jones was never

questioned by anyone from the Criminal Investigation Division ("CID"), no footage was reviewed,

and no objective determination on the merits of the complaint was ever made.  To the contrary,

despite expressing his desire to make a complaint, Mr. Jones was not even provided a form upon

which to do so.

30.     On April 28, 2021, Officer Jones was working in dispatch and a woman came in the

police department lobby and was acting very erratically, including throwing chairs around the lobby.

Officer Jones came across the dispatch radio and asked officers to respond to the lobby to handle

the situation.  While the officers were on their way, the woman then laid down on the floor in the

lobby.  Officer Jones took a picture of the woman and then sent the picture, by Snapchat, to other officers in the police department.  **Only a few officers [**No other persons ]received the Snapchat message**, which could be viewed for approximately 10 seconds then erased from the recipient's messages.** [except officers.]

31.     One officer, **who [**however,] received the photograph sent by Officer Jones, [and] reported it to his supervisor.  That supervisor reported it to Officer Jones' supervisor.  Officer Jones was immediately placed on paid suspension [administrative leave] **pending an investigation**.  The ground[s] for the suspension [were] **was** described as "SPD Directives #702 pertaining to Social media use. [sic]."

32.     As part of this suspension, Officer Jones was required to "surrender to his commanding officer his issued badges, identification card and access cards."

33.     On May 12, 2021, Officer Jones **met with Chief Duncan and other supervisors to learn the results of the investigation.  Chief Duncan came to the meeting prepared with 2 type-written letters - a signed termination letter and a resignation letter for Officer Jones' signature. Chief Duncan informed Officer Jones that she had made the decision to terminate him but would allow him to resign.  When Officer Jones asked if he was being given an ultimatum, Chief Duncan responded "yes."  At that point Officer Jones felt compelled to resign and signed the resignation letter Chief Duncan brought to the meeting.** [was told that he must resign from the Salisbury Police Department, or he would be fired.  Given this ultimatum, Officer Jones chose to resign.]

34.     **Chief Duncan noted that she would be "happy" to give him a good reference, if any prospective employer calls.  Meanwhile, Officer Jones' immediate supervisor commended Officer Jones for his work performance and also offered to provide a good reference.**

35.     **For Officer Jones' alleged misconduct, termination was not within the recommended penalty range under the SPD's Disciplinary Process policy, which provides for progressive discipline.**

36.     **Under SPD's Disciplinary Process policy, misconduct such as Failure to Obey a Written Directive (Category A) a 1st offense results in corrective actions like training and/or education or a Performance Observation Form, and for a 2nd offense a written reprimand or loss of leave up to 8 hours/suspension up to 8 hours.  For Conduct Subversive to the Good Order of the Agency (Category B), a 1st offense yields a penalty of a written reprimand or loss of leave up to 8 hours/suspension up to 8 hours and for a 2nd offense a penalty of 16-24 hours loss of leave or 16-24 hours of suspension. Even for the most serious infractions (Category E) the penalty range is "more than" 120 hours loss of leave/120 hours suspension and/or demotion or dismissal. Category E offenses include intentional misrepresentation or lying allegations, harassment and discrimination, weapons violations, use of brutal force without justification, and all criminal violations and attempts.**

37.     **The SPD Social Media Policy and all other SPD policies apply with equal force to all employees, including police officers, dispatchers, and other civilian employees.**

38.     **D**ispatchers **(white females), similarly situated to Officer Jones, violated the SPD's social media policy and/or Code of Conduct before and after his termination, but they were not disciplined much less terminated.  For example, one dispatcher (LW) made several disparaging comments and references about homosexuals on Facebook and directly in response to SPD supervisors' posts, but she was not disciplined and remains employed by SPD.  In March 2022 another dispatcher (CS) videotaped on her personal telephone an altercation between citizens in the lobby of the police station and shared the video with co-**

11

workers.  **She has not been charged with violation of SPD's Social Media policy and/or Code of Conduct much less disciplined.**

39.     **[**While SPD forced Officer Jones to resign because it claimed he violated social media policies, there are other examples similar conduct, undertaken by other] **In addition, there is a history of** SPD officers and **other** employees **(all white),** [where] **who also violated SPD's social media policy and/or Code of Conduct but** SPD **and Chief Duncan** took no disciplinary action, which establish the [actions] alleged reasons for Officer Jones' discipline are pretextual.



These include:





40.     During Officer Jones' tenure with SPD and even after his termination, SPD, Chief Duncan, and other SPD supervisors refused and continue to refuse to discipline or otherwise hold white employees accountable for other types of violations of SPD policies and procedures despite knowledge of same and violations being widespread throughout the SPD.

41.     For example, one dispatcher (TM - white female) failed repeatedly to respond properly to "hits to warrants" and mishandled high-risk calls for service.  These failures jeopardized detainees' extraditions and exposed the department to liability, but the dispatcher was never disciplined or even provided additional training despite supervisors' and Chief Duncan's knowledge of the violations and the dispatcher's overall inability to perform the essential functions of her job.

42.     Other SPD employees, including dispatchers (all white), have committed serious violations and remain employed by SPD.  Such violations include use of racist language, lying, stealing SPD time and resources, falsifying court documents, sending Snapchat messages with videos of women acting in sexually explicit ways, sexual harassment of subordinates, sleeping on the job, smoking on the job, posting hate speech and threats, and various other social media posts that would reflect negatively on the SPD. These violations were widely known throughout the SPD by supervisors and Chief Duncan.

43.     After Officer Jones' termination, SPD and Chief Duncan used the "blocking" function on SPD's social media sites, including Facebook Page, to block Officer Jones' access to the sites, which provide valuable information to the public about law enforcement activities, crime, accidents, etc. Officer Jones has a continued interest in accessing SPD's public sites to get information to help his aging parents navigate life in the City of Salisbury.

44.     After Officer Jones' termination, SPD and Chief Duncan hired a white female dispatcher to replace him.

45.     Chief Duncan had previously discriminated against Officer Jones based on his race in 2019.  In July 2019 Officer Jones sought approval from Chief Duncan for a T-shirt he had designed that employees of the communication branch could wear on "casual" Fridays, a practice engaged in by employees of other units within SPD.  Chief Duncan did not give her approval although the T-shirts designed by Officer Jones met SPD standards of professionalism.

46.  When Officer Jones asked her why his design was not approved but it appeared she had approved T-shirt designed by white employees in other units, Chief Duncan claimed the T-shirts were not approved.  Yet Chief Duncan allowed those employees to continue wearing the T-shirts without consequence.  Since July 2019 white employees of

14

other units have designed and obtained Chief Duncan's approval to print and wear T-shirts on Fridays.

47.    Defendants' conduct was outrageous, malicious, wanton, reckless, and/or in willful disregard of Officer Jones' rights under the law.

## [VENUE AND JURISDICTION

28.    This court has jurisdiction over this action pursuant to the provisions of 28 U.S.C. §§ 1331, 1332, 1343 and 1367, as well as principles of supplemental and pendant jurisdiction.  Venue is appropriate in the court pursuant to 28 U.S.C. § 1391.  This Complaint is filed under the Civil Rights Act of 42 U.S.C.S. § 1391.  The causes of action alleged herein arise from factual allegations occurring within this judicial district

29.    The amount in controversy exceeds $75,000.00.

## PARTIES

30.    Plaintiff, Kamel B. Jones, Jr., is an individual who resides in Salisbury, Maryland.

31.    Defendant, Barbara Duncan, is a resident of Salisbury, Maryland and acted both individually and under color of law as an agent or employee of the City of Salisbury, Maryland, and as Chief of the Salisbury Police Department.

32.    Defendant, the City of Salisbury, Maryland is a municipality located within this District.  ]

## COUNT I – TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (EMPLOYMENT DISCRIMINATION BASED ON RACE) (City of Salisbury Only)

48.    Plaintiff, Kamel B. Jones, Jr. incorporates by reference the facts and allegations set forth in **the preceding** paragraphs [1-32 above], as if fully set forth hereunder.

49.    Officer Jones, who is Black, is a member of a protected class.

50.    Officer Jones suffered an adverse employment action when he was forced to resign

from employment at the SPD.

51. At the time he was forced to resign, Officer Jones met the legitimate employment expectations of the SPD **as evidenced by the scores on his performance evaluations, his selection as a field training officer to train new recruits to the communications unit, and his immediate supervisor's praise of his work during the termination meeting.**

52. Officer Jones was treated differently than similarly situated employees at the SPD who are not Black and are outside his protected class, **including three dispatchers (white females) referred to in Paragraphs 38 and 41. TM and Officer Jones were all employed less than 5 years as dispatchers with SPD while CS was employed less than 1 year at the time of incidents at issue, performing the same duties, under the same supervisors, and subject to the same rules, including the Social Media Policy, Code of Conduct, and disciplinary matrix. CS engaged in similar conduct to Officer Jones while TM engaged in more egregious conduct, but CS and TM were not disciplined by Defendants.**

53. **Officer Jones' alleged violation did not rise to the level of a terminable offense under SPD's disciplinary matrix.**

54. There are numerous examples of other SPD officers **and dispatchers** (all white) who broke major rules (and in some cases, laws) and were not disciplined or received a much less-severe discipline than Officer Jones, **including for violations set forth in Paragraph 42**. For example, in November 2021 an officer who was caught falsifying time records for payment was **removed from the police academy but re-hired as a dispatcher even though intentional misrepresentation and lying violations are Category E violations under SPD's disciplinary matrix.** [offered his job back. In addition,] Numerous SPD supervisors (all white) have recently been caught falsifying documentation in the SPD property room. These employees have been demoted one rank but remain employed.

16

55.     In addition, many disciplinary polices at the SPD are violated but unenforced.  For

example, many (all white) **dispatcher and** officers chew tobacco **openly** on the job, and SPD

supervisors know this.  The SPD **and Chief Duncan were [**is] aware of the violations of the

tobacco policy but chose[s] not to enforce it.

> [49.   [The social media policy was enforced as a technicality with the intent of removing
>
> Officer Jones from the SPD, because the SPD was uncomfortable with Officer
>
> Jones' race-related concerns and ideas.  If Officer Jones was white he would not have
>
> been forced to resign.]

> [50.   [The alleged violation of the SPD's social media policy is not the real reason Officer
>
> Jones was forced to resign.  The real reason is that the SPD was uncomfortable and
>
> did not like when Officer Jones would initiate or challenge the SPD on issues related
>
> to race.  The SPD is almost entirely white, and its members (especially its
>
> supervisors) were bothered by Officer Jones' concerns, and did not want to address
>
> them publicly or privately. ]

56.     Defendants' **unlawful termination or forced resignation of Officer Jones**

**because of his race [**misconduct] has caused economic and non-economic damages to him

[Officer Jones].  Officer Jones was forced to resign; therefore he lost his income and benefits.  In

addition, Officer Jones intends to continue to work in law enforcement, and this incident (including

the forced resignation) creates challenges for future employment opportunities.  Officer Jones has

also experienced heightened stress, anxiety, and loss of enjoyment of life as a result of Defendants'

misconduct.  Officer Jones has been damaged, and it is likely that he will continue to experience

these damages in the foreseeable future.

57.     As a direct and proximate result of Defendants' misconduct, Officer Jones has

suffered, and continue**s** to suffer damages, including, but not limited to, past, present, and future economic damages, **humiliation, embarrassment, inconvenience,** and emotional distress.

**WHEREFORE, Plaintiff respectfully demands judgment against Defendant, City of Salisbury, and prays that this Honorable Court:**

**a.  Award compensatory damages in excess of Three Hundred Thousand Dollars ($300,000.00);**

**b.  Award damages and equitable relief for all harm Plaintiff has sustained as a result of Defendant's unlawful conduct, including for loss of promotional potential, reputation, lost wages, lost job benefits he would have received but for Defendant's unlawful conduct;**

**c.  Award medical costs and expenses incurred as a result of Defendant's unlawful conduct;**

**d.  Award the reasonable expenses incurred in this litigation, including reasonable attorney and expert fees, pursuant to 42 U.S.C § 1988 (b) and (c) and pre and post-judgement interest; and.**

**e.  Award such other and further relief as is deemed just and proper.**

[WHEREFORE, Plaintiff Kamel B. Jones, Jr. demands judgment against Defendants Barbara Duncan and the City of Salisbury, jointly and severally, for actual general, special, and compensatory damages in an amount which exceeds Seventy-Five Thousand Dollars ($75,000.00) punitive damages, plus the costs of this action, including attorneys' fees and expenses, and such other relief as the nature of his cause and principles of justice may require.]

**[PRAYERS FOR RELIEF]**

[WHEREFORE, the above premises considered, Plaintiff, Officer Kamel B. Jones, Jr., demands:

1.    That process issue to Defendants, and that they be required to answer in the time allowed by law.

2.    That judgment be rendered in favor of Plaintiff, and against Defendant, on all causes of action asserted herein.

3.    That Plaintiff be awarded compensatory damages against the Defendant in an amount sufficient to punish Defendants and discourage them and others from engaging in similar conduct in the future.

4.    Nominal damages.

5.    That Plaintiff be awarded the reasonable expenses incurred in this litigation, including reasonable attorney and expert fees, pursuant to 42 U.S.C § 1988 (b) and (c) and pre and post-judgement interest.

6.    That Plaintiff receives other further and general relief as it may appear he is entitled.

7.    A jury for the trial of this matter.]

## COUNT II – VIOLATION OF SECTION 1983 (EMPLOYMENT DISCRIMINATION BASED ON RACE UNDER SECTION 1981) (Both Defendants)

**58**.    **Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.**

**59.    Plaintiff is a member of a protected class by virtue of his race (Black or African American).**

**60.    As chief of the police department of the City of Salisbury, Chief Duncan knows discrimination based on race is unlawful under the laws of the United States and Maryland.**

61.     Nevertheless, Defendants unlawfully disciplined Plaintiff because of his race, initially by suspending him from work on April 28, 2021 and then forcing him to resign or be terminated on May 12, 2021 for alleged violation of SPD's Social Media Policy and/or Code of Conduct.

62.     Even if Officer Jones had violated Defendants' policies, SPD's disciplinary matrix does not provide for termination or forced resignation for the alleged violation.

63.     At the time Defendants suspended Officer Jones' and ultimately forced termination of his employment, he was performing his job satisfactorily and meeting the legitimate expectations of the SPD as evidenced by the scores on his performance evaluations, his selection as a field training officer to train new recruits to the communications unit, and his immediate supervisor's praise of his work during the termination meeting.

64.     Officer Jones was treated differently than similarly situated employees at the SPD who are not Black and are outside his protected class, including three dispatchers (white females) referred to in Paragraphs 38 and 41.   TM and Officer Jones were all employed less than 5 years as dispatchers with SPD while CS was employed less than 1 year at the time of incidents at issue, performing the same duties, under the same supervisors, and subject to the same rules, including the Social Media Policy, Code of Conduct, and disciplinary matrix.  CS engaged in similar conduct to Officer Jones while TM engaged in more egregious conduct, but CS and TM were not disciplined by Defendants.

65.     Officer Jones' alleged violation did not rise to the level of a terminable offense under SPD's disciplinary matrix.

66.     There are numerous examples of other SPD officers and dispatchers (all

white) who broke major rules (and in some cases, laws) and were not disciplined or received a much less-severe discipline than Officer Jones, including for violations set forth in Paragraph 42.  For example, in November 2021 an officer who was caught falsifying time records for payment was terminated from the police academy but re-hired as a dispatcher. Numerous SPD supervisors (all white) have recently been caught falsifying documentation in the SPD property room.  These employees have been demoted one rank but remain employed by SPD.

67.     In addition, many disciplinary policies at the SPD are violated but not enforced.  For example, many (all white) officers chew tobacco on the job, and SPD supervisors know this.  The SPD and Chief Duncan were aware of the violations of the tobacco policy but chose not to enforce it.

68.     Chief Duncan is the final decision maker and signs off on all policies and procedures before they are issued for Defendant, City of Salisbury's police department, including the social media policy, Code of Conduct and disciplinary procedures.

69.     Yet, despite issuance of written policies and procedures for SPD, Defendants turned the proverbial "blind eye" and refused to enforce such policies and procedures, including the social media policy and Code of Conduct, against white employees who engaged in misconduct.  This inaction in the face of known violations of the policies by white employees constitute a custom or policy of deliberate indifference by Defendant, City of Salisbury.

70.     Defendant, Chief Duncan, and other SPD supervisors were acting under color of law and within the scope of their employment with the City of Salisbury at all times relevant herein.

71.  Defendants' discriminatory treatment of Plaintiff based on his race constitutes a violation of his rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and Section 1981 of the Civil Rights Act of 1866, as amended, actionable under 42 U.S.C. § 1983.

72.  As a direct and proximate cause of Defendants' unlawful conduct alleged throughout this Amended Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages -- including but not limited to past and future loss of income, benefits, promotion and promotional opportunities, career opportunities, medical expenses and costs -- and is entitled to all available legal and equitable remedies.

73.  Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

74.  Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and in the future, and all other losses stated with Plaintiff not contributing in any way thereto.

WHEREFORE, Plaintiff respectfully demands judgment against Defendants, City of Salisbury and Chief Duncan, jointly and severally, and prays that this Honorable Court:

a.  Award compensatory damages in excess of Three Hundred Thousand Dollars ($300,000.00);

b.  Award damages and equitable relief for all harm Plaintiff has sustained as a result of Defendant's unlawful conduct, including for loss of promotional potential, reputation, lost wages, lost job benefits he would have received but for Defendant's unlawful conduct;

c.  Award medical costs and expenses incurred as a result of Defendant's unlawful conduct;

d.  Award punitive damages in excess of Four Hundred Thousand Dollars ($400,000.00) against Defendant, Chief Duncan;

e.  Award the reasonable expenses incurred in this litigation, including reasonable attorney and expert fees, pursuant to 42 U.S.C § 1988 (b) and (c) and pre and post-judgement interest; and.

f.  Award such other and further relief as is deemed just and proper.

### COUNT III -  VIOLATION OF SECTION 1983 (RETALIATION UNDER SECTION 1981) (Both Defendants)

75.     Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

76.     Plaintiff engaged in statutorily protected activity when he opposed racially discriminatory practices in the workplace, including by complaining about race discrimination during his meeting with Chief Duncan in June 2020 and complaining about race discrimination to supervisors on or about March 27, 2021.

77.     As chief of police at SPD, Defendant Duncan knew that retaliation for an employee's protected activity is unlawful under the laws of the United States and the state of Maryland.

78.     Nevertheless, as a direct result of and in response to Plaintiff's protected activities Defendants subjected him to materially adverse action(s), including the following: (a) subjecting him to a December 1, 2020 meeting with Sgt. Thompsen and Capt. Brewer about baseless performance issues; (b) subjecting him to a December 4, 2020 meeting with Sgt. Thompsen and Corporal Foy about the same alleged performance issues discussed on December 1, 2020; (c )   issuing to Plaintiff a Counseling Observation Form on December 10, 2020, sanctioned by Chief Duncan; (d) on March 27, 2021 the lieutenant, sergeant and corporal of Plaintiff's division actively discouraged him from filing a written complaint of

23

race discrimination against 2 white officers who made racial "jokes" in Plaintiff's presence; (e ) failing to conduct any investigation or otherwise take any corrective action about Plaintiff's March 27, 2021 verbal complaint; (f) indefinite suspension on April 28, 2021 for alleged violation of SPD's social media policy and/or Code of Conduct; (g) forced resignation/termination of Plaintiff on May 12, 2021 for alleged violation of SPD's social media policy and/or Code of Conduct; and (h)blocked his access to SPD's public social media sites that share important information for city residents and visitors.

79. But for Plaintiff's protected activities he would not have been subjected to the retaliatory actions set forth above because even if he violated SPD's social media policy and/or Code of Conduct, the disciplinary matrix did not provide for termination and similarly situated white dispatchers who engaged in similar or more egregious conduct, as set forth in this Amended Complaint, were not disciplined much less terminated.

80. The alleged violation of the SPD's social media policy and/or Code of Conduct is not the real reason Officer Jones was forced to resign. The real reason is that the SPD and Chief Duncan wanted to stop Officer Jones from bringing any discrimination complaints at the SPD or raising any future concerns about differential treatment based on race, especially since discouragement and refusal to investigate complaints he already made did not temper his resolve. If Officer Jones had not engaged in protected activities he would not have been forced to resign.

81. At all times Defendant, Chief Duncan, and other SPD supervisors were acting under color of law and within the scope of their employment with Defendant City of Salisbury.

82.     Defendants' retaliatory treatment of Plaintiff based on his protected activities constitutes a violation of his rights under Section 1981 of the Civil Rights Act of 1866, as amended, actionable under 42 U.S.C. § 1983.

83.     As a direct and proximate cause of Defendants' unlawful conduct alleged throughout this Amended Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages -- including but not limited to past and future loss of income, benefits, promotion and promotional opportunities, career opportunities, medical expenses and costs -- and is entitled to all available legal and equitable remedies.

84.   Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

85.   Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and in the future, and all other losses stated with Plaintiff not contributing in any way thereto.

WHEREFORE, Plaintiff respectfully demands judgment against Defendants, City of Salisbury and Chief Duncan, jointly and severally, and prays that this Honorable Court:

a.  Award compensatory damages in excess of Three Hundred Thousand Dollars ($300,000.00);

b.  Award damages and equitable relief for all harm Plaintiff has sustained as a result of Defendant's unlawful conduct, including for loss of promotional potential, reputation, lost wages, lost job benefits he would have received but for Defendant's unlawful conduct;

c.  Award medical costs and expenses incurred as a result of Defendant's unlawful conduct;

d.  Award punitive damages in excess of Four Hundred Thousand Dollars ($400,000.00) against Defendant, Chief Duncan;

e.  Award the reasonable expenses incurred in this litigation, including reasonable attorney and expert fees, pursuant to 42 U.S.C § 1988 (b) and (c) and pre and post-judgement interest; and.

f.  Award such other and further relief as is deemed just and proper.

<u>Jury Demand</u>

Plaintiff demands a trial by jury on all counts of this Amended Complaint.

Respectfully submitted,

/s/  *Jeanett P. Henry*
**Jeanett P. Henry, Bar No. 22571**
**8403 Colesville Road**
**Suite 1100**
**Silver Spring, MD 20910**
**(301) 562-1340**
**(240) 638-2701 (fax)**
**Email:  jhenry2085@aol.com**
*Attorney for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 2nd day of January 2023 I served copies of this Amended Complaint (clean and redlined versions) by electronic mail (CM/ECF) on Defendants, through their counsel of record, as follows:

**Raymond R. Mulera, Esquire**
**7225 Parkway Drive**
**Hanover, MD 21076**
**Email :  rmulera@lgit.org**

/s/  *Jeanett P. Henry*
**Jeanett P. Henry**